UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBERT HENRY VANCE, #168560,   )
   )
             Petitioner,   )   Case No. 1:09-cv-137
   )
v.   )   Honorable Paul L. Maloney
   )
MARY K. BERGHUIS,   )
   )   **REPORT AND RECOMMENDATION**
             Respondent.   )
_____)

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254.  Petitioner's convictions stem from the robbery and beating of Lazaro Hernandez, during
which the victim "lost his right eye and teeth, and suffered a fractured cheekbone." *People v. Vance*,
No. 264582, 2007 WL 486704, at * 1 (Mich. Ct. App. Feb. 15, 2007).   On June 23, 2005, a
Kalamazoo County Circuit Court jury found petitioner guilty of assault with intent to rob while
armed, MICH. COMP. LAWS § 750.89, and assault with intent to do great bodily harm less than
murder, MICH. COMP. LAWS §750.84.  On August 1, 2005, Judge J. Richard Johnson sentenced
petitioner to 25-to-50 years' imprisonment on his conviction for assault with intent to rob while
armed and 76 months-to-10 years' imprisonment on his conviction for assault with intent to do great
bodily harm less than murder, enhanced by petitioner's habitual offender status, fourth felony
offense, Mich. Comp. Laws § 769.12. Petitioner's conviction and sentence were affirmed on direct
review and the Michigan courts denied a subsequent motion for post-judgment relief.

Petitioner claims entitlement to federal habeas corpus relief on the following grounds

for relief:

I.      WAS DEFENDANT DENIED THE RIGHT TO AN UNTAINTED JURY WHERE, IN AN *EX PARTE* COMMUNICATION DURING DELIBERATIONS, THE COURT'S BAILIFF ADVISED JURORS THAT NO TRANSCRIPTS OF THE TRIAL WERE AVAILABLE?

II.     WAS DEFENDANT DENIED A FAIR TRIAL BY PLAIN ERROR WHERE THE PROSECUTOR ARGUED TO THE JURY THAT IT COULD OR SHOULD DRAW AN ADVERSE INFERENCE FROM DEFENDANT'S FAILURE TO CALL AS A WITNESS MICKEY VANCE, WHERE IT WAS LIKELY THAT, IF CALLED, MR. VANCE WOULD EXERCISE HIS RIGHT NOT TO INCRIMINATE HIMSELF AND WHERE HIS TESTIMONY (IF ANY) WAS EQUALLY AVAILABLE TO BOTH PARTIES?

III.    WAS DEFENDANT DENIED A FAIR TRIAL BY PLAIN ERROR WHERE LAZARO HERNANDEZ TESTIFIED THAT ELIJAH ALEXANDER HAD TAKEN A POLYGRAPH EXAMINATION, CLEARLY IMPLYING THAT HE HAD PASSED IT, AND IDENTIFIED DEFENDANT AS HERNANDEZ'S ASSAILANT?

IV.    DID THE TRIAL COURT ABUSE ITS DISCRETION BY VIOLATING MCR 6.414(H), WHEN THE TRIAL COURT REFUSED OR COMPLETELY IGNORED TWO SEPARATE REASONABLE REQUESTS BY THE JURY TO REVIEW THE TESTIMONY OF KEY WITNESSES?

V.      WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE VI AMENDMENT TO THE U.S. CONSTITUTION AND MICH. CONST. 1963, ARTICLE 1, § 20?

VI.    WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN VIOLATION OF HIS VI & XIV AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION, AND MICH. CONST. 1963, ARTICLE[] 1, § 20?

VII.   WAS THE DEFENDANT DENIED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS UNDER U.S. CONST. AMEND VI & XIV AND MICH. CONST 1963, ARTICLE I, § 20 TO A JURY ARRAY WHICH IS REPRESENTATIVE OF A FAIR CROSS-SECTION OF THE COMMUNITY, WHERE THERE WERE ON[LY] (2) AFRICAN AMERICANS IN THE ENTIRE JURY ARRAY, WHICH WAS DUE TO THE SYSTEMATIC EXCLUSION OF MINORITIES FROM JURY VENIRES?

(Petition, docket # 1 at ID#s 5-16). The first three claims were raised by appellate counsel on direct appeal, and the remainder were raised for the first time in petitioner's motion for relief from judgment.[1] Respondent has filed an answer to the petition, supported by the trial and appellate records. Respondent asserts that grounds I-III are barred by the procedural default of petitioner's failure to make a contemporaneous objection at trial and that the remaining grounds are barred by the procedural default of failing to raise them on direct appeal. After a review of the record and the submissions of the parties, I conclude that petitioner's claims are meritless and recommend that the petition be denied.

### Proposed Findings of Fact

**A.    Trial**

Petitioner's trial began on June 14, 2005. The entire first day of trial was devoted to jury selection. (Trial Transcript (TT) I, docket # 19). At the conclusion of the day's proceedings, petitioner's attorney and the prosecutor expressed satisfaction with the jury selected. (TT I, 243-44).

It was beyond question that Lazaro Hernandez had been subjected to a brutal beating on March 9, 2004. Petitioner's attorney stipulated to the facts surrounding Hernandez's hospitalization and recovery in order to limit the number of exhibits and witnesses as to the victim's injuries. Petitioner's defense strategy was to argue that he did not inflict any of the victim's injuries. The prosecutor, for similar strategic reasons, stipulated to facts regarding the victim's blood alcohol content and a urine test that had been positive for cocaine. The judge instructed the jurors that they

---

[1]Petitioner's claims based on Michigan's constitution are not addressed herein because they could not possibly provide a basis for federal habeas corpus relief. 28 U.S.C. § 2254(a).

could accept the stipulated facts as true, but were not required to do so. (TT V, 576). The stipulation read to the jury stated as follows:

> That at approximately 3:40 a.m. on March 9, 2004, Lazaro Hernandez was received at Bronson Hospital for treatment in the emergency room.

> That at the time of his admission, Mr. Hernandez was in critical condition.

> That Mr. Hernandez was unconscious upon his reception and had to be placed on a respirator to assist him in breathing.

> That Mr. Hernandez continued to suffer from respiratory failure following his admission at the hospital and had to remain on a respirator – respiratory assistance until March 11, 2004.

> That Mr. Hernandez suffered from multiple areas of bruising, abrasions, and lacerations about his face and head area that required stitches.

> That Mr. Hernandez's right eye was bleeding, swollen shut, and found to be irreparably damaged to the extent that it had to be surgically removed.

> That Mr. Hernandez suffered from skull fractures around the right eye socket and a fracture to the right side of his nasal bone.

> That Mr. Hernandez had lacerations to his upper lip and suffered traumatic loss of multiple teeth along both the upper and lower regions of his jaw.

> That Mr. Hernandez had a puncture wound to his right shin and lacerations to his right calf area.

> That Mr. Hernandez was discharged from Bronson Hospital on March 13, 2004, and he had instructions to have someone provide him with 24-hour supervision after that time to monitor his health.

> That the injuries sustained by Mr. Hernandez are consistent with being caused by impact from a foreign object.

> * * *

> That at the time Mr. Hernandez was brought to the hospital for treatment, a laboratory blood test revealed that Mr. Hernandez had a blood alcohol content of point-one six (.16). However, the blood test could not indicate when the alcohol was consumed.

A urine test was also taken that revealed that Mr. Hernandez tested positive for cocaine in his urine. However, the urine test could not indicate when the cocaine was consumed nor how much cocaine was consumed.

(TT V, 577-79).

Petitioner did not dispute that he was at the location where Lazaro Hernandez had been beaten and robbed. The jury was presented with the task of determining whether petitioner had administered the beating and participated in the robbery or, as he claimed, was an innocent bystander who had attempted to intercede on the victim's behalf.

The prosecution's primary witness against petitioner was Tangie Bates. Ms. Bates was a resident of the neighborhood where the beating occurred. She knew all the parties involved. Ms. Bates testified that she had known petitioner, Robert Vance, and his brother, Mickey Vance, for "10-20 years," as they had all grown up in the area. (TT II, 374-75). She also knew Elijah Alexander, a witness to Hernandez's beating. (TT II, 373). Ms. Bates knew Lazaro Hernandez by the name "Palito." (TT II, 372). On the night in question, Tangie Bates walked to Teresa Givhan's house. She saw petitioner, his brother Mickey, and Elijah Alexander in the porch area of an abandoned house across the street from Ms. Givhan's residence. (TT II, 374-76). She saw Mr. Hernandez at the party at Givhan's house. Tangie Bates left the party a little while after Hernandez. (TT II, 376, 379).

As she was walking home, Ms. Bates saw Hernandez on the ground. Petitioner was standing above him, beating the victim's head with a club-like object. (TT II, 380-82, 404). Petitioner also kicked Hernandez two or three times in the upper body. (TT II, 383). Bates saw Mickey Vance patting down the area of the victim's pockets. (TT II, 384). Ms. Bates never saw Mickey Vance hit Hernandez. (TT II, 386). Elijah Alexander was standing in the area, appearing

somewhat dumbfounded, stating: "Man you don't gotta do that, man. Why are you doing that?" (TT II, 384). Tangie Bates intervened and was able to get Hernandez off the ground and back to her residence. (TT II, 382). As Bates and Hernandez were walking away, petitioner threatened to kill the family of anyone who told the police what had happened. (TT II, 380, 387). Petitioner was still holding the club-like object when he made those statements. (TT II, 387). Tangie Bates feared reprisal by petitioner and his brother Mickey and therefore did not immediately provide the police their names. (TT II, 389-90).

Elijah Alexander was a very reluctant witness, but he did testify that he saw petitioner beating Hernandez's head and face area with a stick or club of some sort. (TT III, 433-36, 448-49). Alexander testified that petitioner's brother Mickey Vance was also hitting Hernandez. (TT III, 448, 454, 471). Alexander testified that he did not assault Hernandez. (TT III, 445).

The victim, Lazaro Hernandez, grew up speaking Spanish, but learned to speak English when he moved to the United States. (TT II, 309). An interpreter was present to assist at trial. Mr. Hernandez had difficulty waiting for questions to be interpreted into Spanish, stating his answers in Spanish, and waiting for his answers to be relayed by the interpreter in English. (TT II, 312-13, 319). Hernandez testified that he had about $700 in cash on him on the night in question. (TT II, 321). Hernandez saw his neighbor Elijah Alexander on the porch of the house opposite Ms. Givhan's house. Hernandez purchased a beer from Alexander and indicated that he would give Alexander a ride home. (TT II, 320-22). Hernandez saw Tangie Bates at the party at Givhan's house. (TT II, 319, 372). Hernandez testified that when he left the party and headed back to pick up Mr. Alexander, he was attacked. (TT II, 322-23, 331). Hernandez identified petitioner and his brother as the men who beat and robbed him. (TT II, 323, 347). According to Hernandez, petitioner

and his brother both beat him with weapons that were about three feet long and demanded his money. (TT II, 332-34, 336, 341). The beating continued after they took Hernandez's cash. (TT II, 341, 344, 368). It stopped only when Tangie Bates started to help Hernandez back to his feet and Elijah Alexander restrained petitioner so that he could not continue hitting Hernandez. (TT II, 342). Hernandez testified that Elijah Alexander never hit him. (TT II, 347).

Hernandez testified that as a result of the beating administered by petitioner and his brother, he lost his eye, upper and lower teeth, and suffered scarring on his face and head, a crushed cheekbone and broken hand. (TT II, 345-46). He was unconscious in the hospital and on a respirator. It took almost a week before Hernandez's medical condition improved to a point he could be interviewed by Detective Gregory Hatter. (TT III, 554-55).

Hernandez conceded that he had been drinking on the night he was attacked and that days earlier he had used cocaine. He admitted that he gave false testimony at the preliminary examination hearing when he stated that he had not been drinking on the night he was beaten. (TT III, 350). He testified that his consumption of alcohol did not have an impact on his ability to see the men who assaulted him with "stick-like objects." He stated: "I had him [petitioner] right in front of me. I saw him well, hitting me and hitting me and hitting me. I'm never going to forget his face nor the face of his brother." (TT II, 350).

Cross-examination elicited further testimony from the victim regarding his decision to enter a high-crime area, after midnight, carrying a large amount of cash. Defense counsel questioned Hernandez about his alcohol and cocaine use. Hernandez testified that the cash he had been carrying was for paying bills rather than for purchasing cocaine. (TT II, 350-59). During cross-

examination regarding the statement Hernandez gave to Detective Hatter, the victim gave a non-responsive answer in which he mentioned a lie detector:

> Q      Eventually after you got out of the hospital, do you recall an officer by the last name of Hatter coming to visit you?
>
> A      Yes.  Gregory Hois (sic).
>
> Q      Hatter?
>
> A      Gregory Hatter.
>
> Q      Right
>
> A      H-A-T-T-E-R.
>
> THE COURT:  For the record, the witness has handed the interpreter a card.
>
> * * *
>
> Q      All right.  He visited you, do you recall, a few days after you got out of the hospital?
>
> A.      Yes.
>
> Q      When he visited you and you gave him a statement, you had no idea of someone called Mickey, did you?
>
> A      When I left the hospital, I told the detective that there were two.  I didn't know they were brothers, but I could identify and describe those who did it.
>
>       And the detective told me that they had one of them arrested and they had arrested somebody else.  And they arrested two people.  One of them was him and another was my neighbor Alexander.  And they asked me did Alexander hit you, and I told him no.  And Alexander informed us that it had been Roberto and his brother. And Alexander had taken a lie detector test and it was  --
>
> Q      Stop right there.  So the way that you found out who you believed the attackers were, was conversations between the police officer and Alexander?
>
> A      Telling that the girl that picked me up from the ground knew them.

Q       I'm going to ask the same question again and see.  The way that you are identifying
        Mr. Robert Vance and Mickey Vance is by information given to you from either
        Detective Hatter or Mr. Alexander, is that correct?

A       By means of the detective I learned the names of them.  I was sure that I could
        recognize them because I saw them.

(TT II, 359-61).  Shortly thereafter, when the jury was excused for an afternoon break, Judge

Johnson noted that a fleeting reference to a lie detector had occurred and inquired whether defense

counsel or the prosecutor wanted the court to give the jury a cautionary instruction:

> Counsel, let me recognize that the witness at one point volunteered a reference to a lie
> detector test referencing a Mr. Alexander.  Mr. Svikis I noticed cut the comment short.  I
> simply raise this because if anyone wants me to give a cautionary instruction, I will.  I
> recognize sometimes for strategic reasons attorneys would just as soon leave the matter
> alone.  But I did notice that, so I place it on the record.  If anyone wants me to address it, I
> will.
>
> Anything either of you wish me to cover?
>
> MR. SVIKIS:  Not a cautionary instruction – oh.  The witness was in the courtroom.  It's just
> that the witness should be told not to talk about the polygraph examination.
>
> THE COURT:  All right.  If the assistant prosecutor would mention to the witness that he
> should not volunteer anything about polygraph examinations, I'll leave it at that.
>
> Anything else before we go into recess?
>
> MR. ANDEREGG:  No, sir.
>
> MR. SVIKIS:  No, your Honor.

(TT II, 366-67).  Defense counsel's cross-examination of the victim concluded with emphasis on

Hernandez's false testimony at the preliminary examination that he had not been drinking alcohol

on the night in question.  (TT II, 369).

        Officer Kennedy Crawford of the Kalamazoo Department of Public Safety testified

that he found Lazaro Hernandez sitting on the front porch steps with a female, Tangie Bates,

standing over him.  (TT II, 285).  Hernandez was semi-conscious, bleeding profusely from extensive injuries to his face and head, and he "appeared to be in a lot of pain."  (TT II, 286, 298).  Hernandez was able to communicate that he had been robbed.  (TT II, 297).  Officer Crawford called for medical assistance and applied direct pressure to Hernandez's most serious wounds until medical assistance arrived.  (TT II, 298).  Given the seriousness of the victim's injuries, Crawford followed the ambulance when EMS workers transported Hernandez to the hospital.  (TT II, 299).  Police later recovered a number of teeth and the bloody stick from the area.  (TT III, 480-82).  Petitioner's coat and pants had bloodstains on them.  (TT III, 506-11).  Droplets suspected to have been blood were found on petitioner's shoes.  (TT III, 524).

Eric Epinger testified that in June 2004, he and petitioner were being held at the Kalamazoo County jail.  (TT III, 528-29).  According to Epinger, petitioner related that he and his brother had an altercation with a "Mexican guy."  (TT III, 532).  Epinger stated that the version of events related to him in jail featured petitioner's brother chasing after this guy, hitting him with a weapon, and knocking him to the ground.  (TT III, 534).  Petitioner claimed a less significant role, limited to kicking and punching the victim.  (TT III, 535).  Mr. Alexander had tried to stop petitioner and his brother from beating this individual.  (TT III, 536).

Petitioner elected to take the witness stand.  (TT IV, 574, 587).  He denied hitting Hernandez with a stick or assisting anyone else in robbing him.  He denied intent to murder Hernandez.  (TT IV, 587-88).  Petitioner denied striking or kicking Hernandez.  (TT IV, 593).  Petitioner's version of events at trial was that he had tried to break up the beating being administered by his brother Mickey Vance and his friend Elijah Alexander.  (TT IV, 592-93).  Petitioner conceded

that he told Detective Hatter that Mr. Alexander had nothing to do with the assault and that all Alexander had tried to do was break up the fight. (TT IV, 597).

The attorneys delivered their closing arguments. (TT IV, 605-65). Petitioner's attorney argued that there was no credible testimonial evidence supporting the prosecution's case, because the witnesses who had identified petitioner as the perpetrator were known to lie and had lied under oath at trial. He argued that there was no corroborating forensic evidence. (TT V, 638-45). The prosecutor's rebuttal included an argument that petitioner had the motive to lie and that his version of events was not supported by any other witness:

> There's been no reference of motive to lie for any of the witnesses that testified on behalf of the People. The defendant has plenty of motive to lie. He lied to the police when they spoke with him. He lied to Eric Epinger partially. And he lied to you when he got on the stand. And he's the only one that got up there and lied.
>
> I guess we could all be wondering if Mickey Vance is the one that was beating on Mr. Hernandez, and Mr. Van -Mickey - or Robert Vance had nothing to do with it, where's Mickey Vance to tell us that.

(TT V, 664). There was no objection to this rebuttal argument. (TT V, 649-65). The judge delivered the jury instructions without objection. (TT V, 665-86). Among other things, the judge instructed the jury that it was to communicate through notes written by the foreperson: "If you want to communicate with me while you are in the jury room, please have your foreperson write a note and give it to the bailiff. It is not proper for you to talk directly with the judge, lawyers, court officers, or other people involved in this case." (TT V, 685).

On June 22, 2005, the jury retired and began deliberation at 3:19 p.m., and left for the day around 5:00 p.m. (TT IV, 689; TT V, 695). The next day, the court received a written inquiry

from the jury regarding what would happen if the jury could not reach a unanimous verdict.  Judge

Johnson summarized the jury's question as follows:

> THE COURT: Good afternoon.  Mr. Vance is present.  The jury is not.
>
> Let me try to update the record.  After the jury departed to deliberate yesterday, we did not have any communications other than through the bailiff basically indicating that they were ready to go home for the evening, and they departed a bit before 5:00.
>
> Then this morning they came back at 9:00, went directly to the jury room and have been deliberating since.  At midmorning, and I don't know the time, but sometime this morning, the bailiff alerted me that once he had been up to see the jury, they asked him verbally something about transcripts, and he indicated that there were no transcripts of the proceedings.
>
> Later in the morning, I believe it was right at noon, again verbally they were asking him about the videotape of the proceedings.  And again, this was spoken.  And I think it was in the course of his trying to determine whether they were going to keep deliberating through the noon hour, and he's present and can correct me, but I think he conveyed to them that this was something that the Judge would have to address with the lawyers, or something to that effect, and that the Judge was not available.  I was just leaving to go to a noon meeting.  I don't think he in any way precluded a renewal of any request to review anything, and I've heard nothing about it since.
>
> Then a little while ago we received a written message.  And at this point the attorneys were contacted, as they'd been away from the courtroom with the permission of the Court.  The message reads: If we don't have a unanimous vote, what's the next step.  Is it a possibility of a hung jury?  How would that be different from a not guilty or acquittal?

(TT V, 695-96).  The jury's question was hypothetical rather than a statement that it was unable to

reach a verdict.  It was recognized as such by the judge and the attorneys.  (TT V, 696-98).  At 4:12

p.m. the jury was seated in the courtroom.  Judge Johnson instructed that if the jury was having

difficulty reaching a verdict, the foreman should let the court know by means of a written note from

the foreperson.  If the court received such a note, then it would provide further instructions.  (TT V,

699).  "But the question, at least as phrased, as it begins, appears to be hypothetical, and therefore,

I'm not going to go further in response until I have some sense of the state of your deliberations."

(TT V, 699).  There were no objections to Judge Johnson's instructions or the jury's verbal

communications with the bailiff.  The jury sent a note indicating that it was not hung and that

deliberations were continuing.  (TT V, 701).  Shortly thereafter, the jury returned its verdict finding

petitioner guilty of assault with intent to rob while armed and assault with intent to do great bodily

harm less than murder.  (TT V, 702-05).

On August 1, 2005, Judge Johnson sentenced petitioner (Sentencing Transcript (ST),

docket # 24).  Judge Johnson considered a number of factors in sentencing., including petitioner's

lengthy criminal history, which included seven prior felony offenses.  (TT 4, 11-15).  Further,

petitioner had been observed punching, kicking, and hitting the victim with a stick.  The victim had

been taken to the hospital, was admitted in critical condition, and placed on a respirator.  The victim

"suffered severe lacerations to the face and head.  Both his upper and lower teeth had been broken

out.  A finger on his hand was broken.  And he also received a severe cut and swelling to his right

eye that later required the eye to be removed."  (ST, 14).  Judge Johnson sentenced petitioner to 25-

to-50 years on the assault with intent to rob while armed conviction and 76 months-to-10 years'

imprisonment on his conviction for assault with intent to do great bodily harm less than murder,

enhanced by enhanced by petitioner's habitual offender status.  (ST 15-16; Judgment of Sentence

Commitment to Corrections Department, found in Michigan Court of Appeals Record, docket # 25).

**B.** **Appeal as of Right**

Petitioner, represented by appellate counsel, appealed as of right to the Michigan

Court of Appeals.  The appellate brief raised three allegations of error:

I.    DEFENDANT [WAS] DENIED THE RIGHT TO AN UNTAINTED JURY
      WHERE, IN AN *EX PARTE* COMMUNICATION DURING DELIBERATIONS,
      THE COURT'S BAILIFF ADVISED JURORS THAT NO TRANSCRIPTS OF THE
      TRIAL WERE AVAILABLE[.]

II.     DEFENDANT [WAS] DENIED A FAIR TRIAL BY PLAIN ERROR WHERE THE PROSECUTOR ARGUED TO THE JURY THAT IT COULD OR SHOULD DRAW AN ADVERSE INFERENCE FROM DEFENDANT'S FAILURE TO CALL AS A WITNESS MICKEY VANCE, WHERE IT WAS LIKELY THAT, IF CALLED, MR. VANCE WOULD EXERCISE HIS RIGHT NOT TO INCRIMINATE HIMSELF AND WHERE HIS TESTIMONY (IF ANY) WAS EQUALLY AVAILABLE TO BOTH PARTIES[.]

III.    DEFENDANT [WAS] DENIED A FAIR TRIAL BY PLAIN  ERROR WHERE LAZARO HERNANDEZ TESTIFIED THAT ELIJAH ALEXANDER HAD TAKEN A POLYGRAPH EXAMINATION, CLEARLY IMPLYING THAT HE HAD PASSED IT, AND IDENTIFIED DEFENDANT AS HERNANDEZ'S ASSAILANT[.]

(Defendant-Appellant's Brief at iii, docket # 25).  In addition, petitioner filed a *pro se* brief arguing that his trial counsel had been constitutionally ineffective when he failed to call two witnesses: (1) a doctor to testify as "to the state of the alleged victim at the time he was assaulted," and (2) Hernandez's landlord to provide testimony regarding the victim's veracity.  (Defendant-Appellant's Supplemental Brief, docket # 1-4, ID#s 79-95).

On February 15, 2007, the Michigan Court of Appeals affirmed petitioner's convictions and sentence.  (02/15/07 Op., docket # 25).  The appellate court found no merit in any argument raised on direct appeal.   It rejected petitioner's argument regarding *ex parte* communications with the jury:

> [D]efendant first asserts that he was prejudiced by an ex parte communication between the bailiff and the jury. Unpreserved claims alleging constitutional error are reviewed for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To avoid forfeiture of an issue on appeal under the plain error rule, three requirements must be met: (1) error must have occurred; (2) the error was plain, that is, clear or obvious; (3) and the plain error affected substantial rights. *Id.* The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. *Id.*
>
> A trial court's ex parte communication with a deliberating jury is prohibited by MCR 6.414(B).  However, a trial court's communication with the jury in violation of MCR

6.414(B) does not require automatic reversal; rather, the determination whether reversal is required "centers on a showing of prejudice." *People v France*, 436 Mich 138, 142; 461 NW2d 621 (1990). To determine the prejudicial effect, the communication must first be categorized into one of three categories: (1) substantive, (2) administrative, and (3) housekeeping. *Id.* at 142-143.

> Substantive communication encompasses supplemental instructions on the law given by the trial court to a deliberating jury. A substantive communication carries a presumption of prejudice in favor of the aggrieved party regardless of whether an objection is raised. . . .

> Administrative communications include instructions regarding the availability of certain pieces of evidence and instructions that encourage a jury to continue its deliberations. An administrative communication carries no presumption. The failure to object when made aware of the communication will be taken as evidence that the administrative instruction was not prejudicial. . . .

> Housekeeping communications are those which occur between a jury and a court officer regarding meal orders, rest room facilities, or matters consistent with general "housekeeping" needs that are unrelated in any way to the case being decided. A housekeeping communication carries the presumption of no prejudice. [*Id.* at 143-144.].

In this case, the ex parte communication is an administrative communication because the jury asked the bailiff about seeing trial transcripts and later about reviewing a video of the proceedings. An administrative communication has no presumption of prejudice and the failure to object when made aware of the communication will be taken as evidence that the instruction was not prejudicial. *Id.* The burden of persuading the court of the absence of prejudice falls on the prosecution. *Id.* at 164 n 36.

We find no prejudice in this case and we reject defendant's contention that, when the bailiff told the jury that transcripts did not exist, it may have led the jurors to believe that the possibility of reviewing evidence was completely foreclosed. MCR 6.414(J) maintains:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence, the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may order the jury to deliberate further without the requested review, so long as the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.

When asked by the jury about transcripts, the bailiff answered that there were no transcripts available. When later asked about a review of a videotape of the proceedings, the bailiff

informed the jury that its question needed to be directed to the judge and attorneys. After these two questions, however, the jury never inquired into transcripts or review of the testimony again before reaching a verdict. The fact that the jury asked about viewing a videotape of the proceedings, after the bailiff had told them no transcripts were available, indicates the jury did not believe the possibility of reviewing the testimony was foreclosed when the bailiff first spoke to them. If the jury felt there was no possibility of reviewing evidence, it would not have bothered asking the bailiff the second question concerning the videotape. Consequently, no plain error has been established because there is no indication that the bailiff's ex parte communications with the jury affected the jury's right to review testimony. The record supports the prosecution's argument that there was no prejudice resulting from the ex parte administrative communication.

(Op., 1-2).

The Court of Appeals rejected petitioner's arguments that prosecutorial misconduct and Hernandez's reference to a polygraph examination had deprived him of a fair trial in violation of his rights under the Due Process Clause:

Defendant next argues that the prosecutor committed prosecutorial misconduct in violation of defendant's constitutional due process rights. Because this claim of error was not properly preserved by objection before the trial court, we shall review it for plain error affecting defendant's substantial rights. *Carines*, *supra*.

We review claims of prosecutorial misconduct to determine whether defendant was denied a fair and impartial trial. *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003). Claims of prosecutorial misconduct must be evaluated on a case-by-case basis within the context of the particular facts of the case. *People v Howard*, 226 Mich App 528, 544; 575 NW2d 16 (1997). A prosecutor's comments must be examined in light of the defendant's arguments and the evidence presented at trial and otherwise improper remarks may not require reversal if they are raised in reply to issues introduced by the defense. *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003).

Defendant argues the prosecution's comment on his failure to produce his brother as a witness was plain error. Defendant argues that the argument was prejudicial because it invited the jury to infer that the testimony would not support defendant's claim of innocence and would be adverse to defendant. We disagree. Defendant took the stand on his own behalf and testified that he saw his brother assaulting the victim and actually tried to stop the altercation. During closing arguments, defendant attacked the prosecution's case, arguing that there was no credible testimonial evidence because the witnesses who identified defendant were known to lie and were lying under oath at trial. Defendant also claimed that there was no corroborating evidence. In rebuttal, the prosecutor asserted:

There's been no reference of motive to lie for any of the witnesses that testified on behalf of the people. The defendant has plenty of motive to lie. He lied to the police when they spoke with him. He lied to Eric Epinger partially. And he lied to you when he got on the stand. And he's the only one that got up there and lied.

I guess we could all be wondering if Mickey Vance is the one that was beating on Mr. Hernandez, and Mr. Van -Mickey - or Robert Vance had nothing to do with it, where's Mickey Vance to tell us that.

The prosecutor's comments were directly applicable to the defendant's own testimony and were made in response to defendant's closing argument. The prosecutor was not prohibited from commenting on the improbability of the defendant's theory or evidence, *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995), and was within his right to argue regarding defendant's failure to produce a corroborating witness. *People v Jackson*, 108 Mich App 346, 351-352; 310 NW2d 238 (1981). Defendant chose to offer a defense that depended on his own credibility and that of his brother. In opting to use this defense, defendant invited argument by the prosecutor concerning the validity and weight of the evidence in support of his theory. Hence, the prosecutor could properly comment on defendant's failure to produce his brother. *Fields*, *supra* at 115-116.

Defendant also asserts on appeal that he was denied a fair trial by an improper reference to a polygraph examination by a witness. Defendant failed to preserve this claim by objection before the trial court. Where a defendant fails to preserve for appeal arguments related to the admission of evidence, this Court reviews for plain error affecting defendant's substantial rights. *People v Herndon*, 246 Mich App 371, 404; 633 NW2d 376 (2001).

Normally, reference to a polygraph test is not admissible before a jury. *People v Nash*, 244 Mich App 93,97; 625 NW2d 87 (2000). However, although reference to a polygraph test is inadmissible, it does not always constitute error that warrants reversal. *Id.* To determine if reversal is warranted, this Court analyzes a number of factors, including:

> (1) whether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test were admitted rather than merely the fact that a test had been conducted. [*People v Rocha*, 110 Mich App 1, 9; 312 NW2d 657 (1981).]

Considering these factors, we conclude that defendant's substantial rights were not affected by the cursory reference to the polygraph test. First, defendant did not object to this testimony and did not seek a cautionary instruction. Second, the reference to the polygraph was inadvertent, and was made in response to a question by defense counsel on cross-examination. It was not prompted by the prosecution. The challenged statement was at the tail end of a rambling answer, and it was non-responsive to the question asked. Third,

there was only one brief reference to a polygraph in the presence of the jury. Defense counsel quickly interrupted that reference before the witness could go into further detail, and the issue was never mentioned again. Fourth, there is no indication on the record that the reference to the polygraph test was made in an attempt to bolster the credibility of a witness. Lastly, the results of the polygraph test were never disclosed to the jury.

Based on the context of the reference and, considering all of the other evidence presented against defendant, the error in the reference to the polygraph examination did not affect defendant's substantial rights.

(Op., 3-4).

The Court of Appeals rejected petitioner's argument that his attorney's failure to call

two witnesses constituted ineffective assistance of counsel:

Defendant's last argument on appeal is that his attorney's failure to call two witnesses deprived him of a substantial defense and violated his rights to have the effective assistance of counsel. To establish ineffective assistance of counsel, the defendant must first show: (1) that counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms; and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Toma*, 462 Mich 281, 302-303; 613 NW2d 694 (2000). That is, defendant must show that counsel's error was so serious that the defendant was deprived of a fair trial, i.e., the result was unreliable. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002).

Defendant contends that his attorney erred by not calling two additional witnesses to testify on his behalf. The two witnesses would allegedly have testified concerning the victim's intoxication at the time of the attack, the affect of that intoxication on the victim and the victim's veracity. A trial counsel's decisions concerning what witnesses to call and what evidence to present are matters of trial strategy. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "In order to overcome the presumption of sound trial strategy, the defendant must show that his counsel's failure to call [the] witnesses deprived him of a substantial defense that would have affected the outcome of the proceeding." *People v Daniel*, 207 Mich App 47, 58; 523 NW2d 830 (1994). Defendant was not deprived of a substantial defense by his trial counsel's failure to call these witnesses. The victim admitted that he was drinking, and a toxicology report determined his blood-alcohol level was .16 at the time. Further, defendant admitted to lying under oath at the preliminary examination. Hence, the testimony of the two additional witnesses would merely have been cumulative.

(Op., 4-5).

Petitioner sought review of the above-referenced issues in Michigan's highest court.

On June 26, 2007, the Michigan Supreme Court denied petitioner's application for discretionary review. (06/26/07 Order, found in Michigan Supreme Court record, docket # 26).

### C. Post-conviction Motion

On February 15, 2008, petitioner filed a motion in Kalamazoo County Circuit Court for relief from judgment under Rule 6.500 of the Michigan Court Rules. He raised the following issues:

> I.   DID THE TRIAL COURT ABUSE ITS DISCRETION BY VIOLATING MCR 6.414(H), WHEN THE TRIAL COURT REFUSED OR COMPLETELY IGNORED TWO SEPARATE REASONABLE REQUESTS BY THE JURY TO REVIEW THE TESTIMONY OF KEY WITNESSES?
>
> II.  WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE VI AMENDMENT TO THE U.S. CONSTITUTION AND MICH. CONST. 1963, ARTICLE 1, § 20?
>
> III. WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN VIOLATION OF HIS VI & XIV AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION, AND MICH. CONST. 1963, ARTICLE[] 1, § 20?
>
> IV.  WAS THE DEFENDANT DENIED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS UNDER U.S. CONST. AMEND VI & XIV AND MICH. CONST 1963, ARTICLE I, § 20 TO A JURY ARRAY WHICH IS REPRESENTATIVE OF A FAIR CROSS-SECTION OF THE COMMUNITY, WHERE THERE WERE ON[LY] (2) AFRICAN AMERICANS IN THE ENTIRE JURY ARRAY, WHICH WAS DUE TO THE SYSTEMATIC EXCLUSION OF MINORITIES FROM JURY VENIRES?

(Motion for Relief from Judgment, docket # 1-3, ID#s 24-25). On March 6, 2008, Judge Johnson denied petitioner's motion for post-conviction relief. He found that the Michigan Court of Appeals had already rejected petitioner's argument regarding the jury's review of the evidence:

Defendant claims his first issue is pursuant to MCR 6.414(H), which addresses instructions to the jury. Defendant is incorrect in his cited court rule. MCR 6.414(J) addresses the issue of the jury's review of evidence and states:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence, the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may order the jury to deliberate further without the requested review, so long as the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.

Defendant presented this issue to the Court of Appeals, which found no prejudice and no plain error was established because there was no indication that the jury's right to review testimony was affected by the bailiff's ex parte communication regarding the availability of transcripts and testimony. Therefore this issue alleges grounds for relief, which were decided against Defendant in a prior appeal and Defendant has not established that a retroactive change in the law undermined the prior decision, pursuant to MCR 6.508(D)(2).

(03/06/08 Order at 4, found in Michigan Court of Appeals Record, docket # 27).

Judge Johnson rejected petitioner's claims of ineffective assistance of trial and appellate counsel:

> Next, Defendant's claims of ineffective assistance of trial and appellate counsel are based on presentation of witnesses, ex parte communications, and presentation of trial and appellate issues. A Defendant that claims he has been denied the effective assistance of counsel must establish that (1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms, and (2) a reasonable probability exists that, in the absence of counsel's professional errors, the outcome of the proceedings would have been different. *People v Avant*, 235 Mich App 499, 507 (1999); *People v Pickens*, 446 Mich 298, 303 (1994).

> Again, Defendant presented this issue to the Court of Appeals, which found no errors warranting reversal. Defendant has not established that his trial or appellate counsel's performance was below the objective standard of reasonableness under prevailing professional norms nor that the outcome of the proceedings would have been different.

> Defendant's additional claims of ineffective assistance of trial and appellate counsel could have been raised on appeal from the conviction and sentence or in a prior motion and he has not demonstrated good cause for failure to raise the issues on appeal and has not shown actual prejudice from the alleged irregularities.

(03/06/08 Order at 5).

Judge Johnson rejected petitioner's challenge to the jury array, finding no evidence to support it and the absence of good cause for raising the issue at such a late date:

> Finally, Defendant claims he was denied his right to have a jury array, which was made up of a fair cross-section of the community. Defendant asserts this is newly discovered evidence pursuant to MCR 6.502(G), which addresses successive motions filed pursuant to MCR 6.500.
>
> Again, Defendant is incorrect in his cited court rule. Defendant has not previously filed a motion for relief from judgment and therefore MCR 6.502(G) does not apply and is not properly before this Court. In any event, Defendant presents no newly discovered evidence or any explanation for raising this issue at this late date.

(03/06/08 Order at 5). Judge Johnson concluded that the "Motion for Relief from Judgment allege[d] grounds for relief, which were decided against the defendant previously, or allege[d] grounds for relief, which could have been raised on appeal. Although Defendant claim[ed] otherwise, Defendant ha[d] not shown good cause for failing to raise such grounds, nor actual prejudice. MCR 6.508(D)(3)." (03/06/08 Order at 5).

Petitioner sought leave to appeal in Michigan's appellate courts. On July 24, 2008, the Court of Appeals denied petitioner's delayed application for leave to appeal "for fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (07/24/08 Order, docket # 27). On January 9, 2009, the Michigan Supreme Court entered its order denying petitioner's application for leave to appeal because petitioner "failed to meet his burden of establishing entitlement to relief under MCR 6.508(D)." (01/09/09 Order, docket # 28).

### D. Habeas Corpus Petition

On February 17, 2009, petitioner filed his petition for federal habeas corpus relief. He raises the grounds rejected by the Michigan Court of Appeals on direct appeal and the grounds rejected by the trial court when it denied his motion for post-conviction relief.

### Standard of Review

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (*per curiam*); *Renrico v. Lett*, 130 S. Ct. 1855, 1862 (2010). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that state-court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. at 693-94. It prohibits

"using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*). The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 131 S. Ct. at 786. Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;[2] or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Metrish v. Lancaster*, 133 S. Ct. at 1786-87; *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010).

## Discussion

Respondent raises the defense of procedural default to all grounds raised by petitioner. (Answer, docket # 8). Under a long line of Supreme Court cases, an adequate and independent finding of procedural default by the state courts will also bar federal habeas review of

---

[2] Under this standard, a lower court must ground its decision on the "holdings" as opposed to the "dicta," of Supreme Court decisions as of the time of the relevant state-court decision. *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court[.]' 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 132 S. Ct. at 2155; *see Marshall v. Rogers*, 133 S. Ct. 1446, 1450-51 (2013).

a federal claim, unless the habeas petitioner can show cause for the procedural default and prejudice attributable thereto. *See Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). The doctrine of procedural default is applicable where petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *See Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011); *VanHook v. Bobby*, 661 F.3d 264, 269 (6th Cir. 2011). The state may assert a procedural default when the last reasoned opinion of the state courts clearly relies on a procedural bar in refusing to consider a claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If a petitioner is guilty of a procedural default in the state courts, the federal habeas court will only entertain the defaulted issue if petitioner bears the burden of showing cause and prejudice or can show actual innocence. *Murray*, 477 U.S. at 485; *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994).

Here, it is not necessary to determine whether the grounds asserted by petitioner are barred by procedural defaults, because the grounds raised by petitioner are meritless. The Supreme Court and the Sixth Circuit have indicated that the district court has discretion to ignore procedural defaults and proceed directly to the merits of apparently defaulted claims, when to do so would be more expeditious than an analysis of the procedural default questions. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009). A detailed analysis of the procedural default issues is unnecessary, because all grounds raised by petitioner are insubstantial.

# I.    Ex Parte Communication

In ground I, petitioner argues that he was "denied his right to an untainted jury where, in an *ex parte* communication during deliberations, the court's bailiff advised jurors that no transcripts of the trial were available." (docket # 1 at 6, ID# 6; Ex B-5, 13-17, docket # 1-4, ID#s 58, 66-70). The record shows that an unidentified member of the jury made a verbal inquiry to the bailiff about transcripts and received a response that no transcripts were available. When a similar inquiry was made regarding the videotape of the proceedings, the bailiff indicated that such a request must be directed to the judge. Judge Johnson found that the bailiff's responses to these inquiries did not "in any way preclude[] a renewal of any request to review anything." (TT V, 695-96). Judge Johnson did receive a written hypothetical question from the jury inquiring what would happen if the jury could not reach a unanimous decision. (TT V, 696). The judge advised the jury that if they were having trouble reaching a verdict, that fact should be conveyed to him by way of a note from the jury foreperson. (TT V, 699). He instructed the jurors to put any requests they might have in writing: "If you wish to communicate with me further, you are welcome to do so. And please, as you've done, put your requests in writing, whatever they may be." (TT V, 699-700). The judge did not receive any written request from the jury asking to review the video of the trial proceedings or trial transcripts. (TT V, 696).

The Michigan Court of Appeals rejected petitioner's argument that the bailiff's *ex parte* communications had violated his constitutional rights. The Court of Appeals found "no prejudice" to petitioner. (Op. at 2). It rejected petitioner's argument that when the bailiff told the jury that there were no transcripts, jurors were led to believe that the possibility of reviewing evidence was completely foreclosed. (*Id.*).

Petitioner relies on the briefs he filed in state court.[3] The only Supreme Court authority petitioner cites in support of his argument is the Supreme Court's *per curiam* decision in *Rushen v. Spain*, 464 U.S. 114 (1983). (Pet. Brief at B-14, docket # 1-4, ID # 67). The Supreme Court's *Rushen* decision did not clearly establish any constitutional right regarding *ex parte* communications. *Rushen* does not hold that the federal Constitution is violated by a bailiff's communications with a deliberating jury on procedural matters. Therefore petitioner's claim falters at the threshold of AEDPA -- he cannot base his claim on the holding of any Supreme Court decision.

If anything, *Rushen* supports the denial of habeas corpus relief in this case, because the Supreme Court emphasized that on habeas corpus review, federal courts must defer to a state-court finding that error stemming from *ex parte* communications was harmless. 464 U.S. at 121. In *Rushen*, the respondent, Johnny Spain, was one of six prisoners involved in a prison escape that resulted in the death of three prisoners and three corrections officers. Spain and other prisoners were tried on numerous charges, including murder, conspiracy, and assault. 464 U.S. at 115. Patricia Fagan testified during *voir dire* that she had no personal knowledge of violent crimes – as a witness, victim or otherwise – and that she did not associate the Black Panther Party with any form of violence. *Id.* During the course of trial, the prosecution sought to impeach defense witness Pratt by introducing evidence that he had been in custody for the 1968 murder of a Santa Monica woman

---

[3]Petitioner argues that the *ex parte* communication by the bailiff violated the Michigan Court Rules. Further, he argues that it violated the Michigan Supreme Court's decision in *People v. France*, 461 N.W.2d 138 (Mich. 1990), a case decided on state-law grounds. *See Bourne v. Curtin*, 666 F.3d 411, 414-15 (6th Cir. 2012). Federal habeas corpus relief does not lie for purported errors of state law. 28 U.S.C. § 2254(a).

during the entire period at issue. This triggered juror Fagan's recollection of the murder of a childhood friend, who was the woman that Pratt had been convicted of killing. *Id.* at 116. The following *ex parte* communications occurred between the judge and Ms. Fagan:

> Upon hearing the evidence about Pratt, juror Fagan twice went to the trial judge's chambers to tell him of her personal acquaintance with Pratt's 1968 murder victim. She told him that she feared that she might cry if the 1968 murder were explored further at trial. The judge asked her on each occasion whether her disposition of the case would be affected. She assured him that it would not. The judge told her not to be concerned and that the matter probably would not be mentioned again. He made no record of either conversation, and he did not inform the defendants or their counsel about them.

464 U.S. at 116. At the close of trial, the jury found Johnny Spain guilty of two counts of murder and of conspiracy to escape, and he was sentenced to life imprisonment. *Id.* The California courts upheld the convictions, finding that petitioner suffered no prejudice as a result of the *ex parte* communications. A federal district court and the Ninth Circuit overturned the convictions on habeas review, based on a conclusion that an unrecorded *ex parte* communication could never constitute harmless error. *Id.* at 117. The Supreme Court "emphatically disagree[d]" and overturned the grant of federal habeas corpus relief. 464 U.S. at 117.

The Supreme Court began its analysis by assuming, without deciding, that the *ex parte* communications constituted constitutional error:

> Petitioners have apparently conceded, in both federal and state court, that the undisclosed ex parte communications established federal constitutional error. [] We acknowledge that the trial judge promptly should have notified counsel for all parties after the juror approached him. Whether the error was of constitutional dimension in this case is not before us. Because we find that no actual prejudice was shown, we assume, without deciding, that respondent's constitutional rights to presence and counsel were implicated in the circumstances of this case. Justice STEVENS suggests that the only constitutional right implicated in this case is a possible due process right to a mid-trial hearing on the subject of the juror's impartiality. *See post*, at 456 (STEVENS, J., concurring in the judgment). Had the State raised the underlying constitutional right as an issue in the courts below and in its petition for certiorari, this approach might merit consideration. But the case came to us

alleging harmless violations of the right to be present during all critical stages of the proceedings and the right to be represented by counsel, and we therefore analyze only that challenge. These rights, as with most constitutional rights, are subject to harmless error analysis

464 U.S. at 118 n.2 (collecting cases). The Supreme Court held that the lower federal courts failed to give the deference required to the state-court finding of harmless error. *Id.* at 121. The Court decided *Rushen v. Spain* years before AEDPA went into effect. The AEDPA standard applies in this case and requires an additional layer of deference in the state court's application of federal law. The findings of the Michigan courts that petitioner suffered no prejudice and that no constitutional violation occurred easily withstand scrutiny under the AEDPA standard. 28 U.S.C. § 2254(d); *see Metrish v. Lancaster*, 133 S. Ct. 1781, 1792 (2013).

## II.    Prosecutorial Misconduct

In ground II, petitioner argues that he was deprived of a fair trial by prosecutorial misconduct when the prosecutor argued in rebuttal that the jury "could or should draw an adverse inference from petitioner's failure to call as a witness Mickey Vance where it was likely that, if called, Mr. Vance would exercise his right not to incriminate himself and where his testimony (if any) was equally available to both parties." (docket # 1 at 7, ID# 7; Pet. Brief at B-12 through B-17, docket # 1-4, ID#s 70-75). The Michigan Court of Appeals rejected this claim.[4] Thus, the AEDPA standard applies. *See* 28 U.S.C. § 2254(d).

The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529

---

[4]In *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009), the Sixth Circuit held that federal constitutional claims reviewed for plain error by a state court are claims adjudicated on the merits and are entitled to review under the AEDPA standard.

(6th Cir. 2000). This court does "not possess supervisory powers over state court trials." *Id.* "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.* "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) ("'[T]he appropriate standard of review for ... a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.'") (quoting *Darden*, 477 U.S. at 181). To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *see Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012). "'[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor,' because 'the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" *Beuke v. Houk*, 537 F.3d 618, 646 (6th Cir. 2008) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Even if the prosecutor's conduct was improper or "universally condemned," the habeas court can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. *See West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008). A petitioner must do more than show erroneous conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)); *see Parker v. Matthews*, 132 S. Ct. at 2153. Under AEDPA, this bar is heightened by the deference that the court must accord state-court rulings. *See Parker v. Matthews*, 132 S. Ct. at 2155.

The Michigan Court of Appeals found no prosecutorial misconduct. "The prosecutor's comments were directly applicable to the defendant's own testimony and were made in response to defendant's closing argument. The prosecutor was not prohibited from commenting on the improbability of the defendant's theory or evidence, and was within his right to argue regarding defendant's failure to produce a corroborating witness. Defendant chose to offer a defense that depended on his own credibility and that of his brother. In opting to use this defense, defendant invited argument by the prosecutor concerning the validity and weight of the evidence in support of his theory. Hence, the prosecutor could properly comment on defendant's failure to produce his brother." (Op. at 3) (internal citations omitted).

The decision of the Michigan Court of Appeals was not contrary to or involve an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Although the prosecutor is precluded from commenting on defendant's invocation of his right to remain silent, *see Griffin v. California*, 380 U.S. 609, 611-12 (1965), the prosecutor may validly ask the jury to draw a negative inference from the defense's failure to support its claims with other available evidence. *See United States v. Ables*, 280 F. App'x 513, 519 (6th Cir. 2008). A prosecutor may argue the record, highlight inadequacies in the defense case, and forcefully assert reasonable inferences from the evidence. *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). The prosecutor's comment had nothing to do with petitioner's own silence and fell well within acceptable constitutional bounds. Furthermore, the fleeting, unobjected-to comment cannot possibly be deemed flagrant, such that it infected the fairness of the trial.

### III.    Polygraph

In ground III, petitioner argues that he was denied a fair trial because the victim mentioned that Elijah Alexander had taken a polygraph examination.  (docket # 1 at 9, ID# 9; Pet. Brief at B-22 through B-25, docket # 1-4, ID#s 75-78).  The Michigan Court of Appeals rejected this claim, finding that the "cursory reference to the polygraph test" did not deprive petitioner of a fair trial.  (Op. at 4).  The "reference to the polygraph was inadvertent, and was made in response to a question by defense counsel on cross-examination.  It was not prompted by the prosecution.  The challenged statement was at the tail end of a rambling answer, and it was non-responsive to the question asked." (*Id.*).  "[T]here was only one brief reference to a polygraph in the presence of the jury.  Defense counsel quickly interrupted that reference before the witness could go into further detail, and the issue was never mentioned again." (*Id.*).  There was "no indication on the record that the reference to the polygraph test was made in an attempt to bolster the credibility of a witness." The "results of the polygraph test were never disclosed to the jury." (*Id.*).  When viewed in context and in light of the other evidence presented against petitioner, the passing reference to a polygraph did not violate petitioner's rights under the Due Process Clause.  (*Id.*).  Petitioner has not shown that the decision of the Michigan Court of Appeals "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

## IV.    Abuse of Discretion Under the Michigan Court Rules

In ground IV, petitioner argues that the trial court abused its discretion under Michigan Court Rule 6.414(J) by not inquiring whether the jury still needed to review the transcripts. (Petition at 10, ID# 10; Ex A-2, docket # 1-3, ID# 24; Ex. B-70, docket # 1-4, ID# 123; Ex. C-49, 57-60, docket # 1-5, ID#s 189, 197-200).  The Michigan Courts found no violation of the court rule. (03/06/08 Order at 4, found in Michigan Court of Appeals Record, docket # 27).  Further, violation of a state court rule is not grounds for federal habeas corpus relief.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a).

## V.    Ineffective Assistance of Counsel

In ground V, petitioner asserts the claims of ineffective assistance of counsel he raised in his Rule 6.500 motion[5] and which were rejected by the trial court on March 6, 2008.  (Petition at 12, ¶¶ 14(C)(2), docket # 1, ID# 12).  Petitioner argues that his trial attorney was ineffective when he:

(1)    Failed to object to the bailiff's *ex parte* communication;

(2)    Failed to object to the prosecution's rebuttal argument regarding petitioner's failure to call his brother as a witness;

---

[5]Petitioner is not asserting the claims of ineffective assistance of trial counsel rejected by the Michigan Court of Appeals on direct appeal.  The claims of ineffective assistance of counsel raised in the habeas corpus petition are the claims petitioner raised in his motion for relief from judgment under Rule 6.500 of the Michigan Court Rules.  (Petition at 12, ¶ 14(b)(1), docket # 1, ID# 12). Even assuming that petitioner intended to assert the claims of ineffective assistance of counsel rejected on direct appeal, they would not provide a basis for habeas corpus relief.  The decision of the Michigan Court of Appeals easily withstands scrutiny under AEDPA standards.  28 U.S.C. § 2254(d).

(3)     Failed to object during rebuttal closing argument when the prosecutor bolstered the testimony of Elijah Alexander;

(4)     Failed to object when the prosecutor elicited testimony from Officer Andres Wells that petitioner had exercised his right to remain silent and when the prosecutor's closing commented on defendant's assertion of his right to remain silent at the time of his arrest;

(5)     Failed to object to Hernandez's testimony mentioning a polygraph examination; and

(6)     Failed to object to the jury array.

(Petition at 12, ¶ 14, Ground V)(citing Ex A-2, docket # 1-3, ID# 24; Ex. B-70, docket # 1-4, ID# 123; Ex. C-49, docket # 1-5, ID# 189; *see* docket # 1-5, ID#s 201-15). Claims of ineffective assistance of counsel are measured under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome. 466 U.S. at 687-88. In adjudicating the first prong of the standard, the court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

The court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. The Sixth Amendment is violated only if counsel's acts or omissions "were outside the wide range of professionally competent assistance." *Id.* Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." *Id.* As for prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S.

364, 372 (1993). "[T]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

   The last reasoned state-court decision on these claims was the order of the Circuit Court denying post-judgment relief; the appellate courts denied review by form order. Because the trial court decided petitioner's claims of ineffective assistance of counsel on their merits, its decision must be afforded deference under AEDPA. *See Harrington v. Richter*, 131 S. Ct. at 784; *Bourne v. Curtin*, 666 F.3d 411, 414 (6th Cir. 2012). To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, petitioner must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586–87 (6th Cir. 2012). This creates a "high burden" for petitioner. *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Bourne*, 666 F.3d at 414. "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).

   Counsel's failure to make a frivolous or meritless motion or objection does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir.

2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007). Several of plaintiff's claims are easily dispatched on this ground. The bailiff's communication was not prejudicial. (Op. at 2). The prosecutor's rebuttal argument was unobjectionable because it was an invited response. (Op. at 3). Hernandez's "non-responsive" and "cursory reference" to a polygraph during cross-examination was interrupted by petitioner's attorney and resulted in no prejudice. (Op. at 4). The Judge offered to give a cautionary instruction, but defense counsel declined the offer as a matter of trial strategy because it was likely to focus the jury's attention on the polygraph. (TT II, 366-67).

      Petitioner's next series of ineffective assistance of counsel claims focuses on the testimony of a minor witness, Officer Andres Wells, and a reference to Wells's testimony in a fragment of the prosecutor's closing argument. Wells testified that, on the night of the robbery, he was provided with a brief description of two suspects. After about 30 minutes of searching the area, Officer Wells encountered two individuals matching the description. When Wells asked these individuals if he could speak to them, he received very different responses. Petitioner indicated that he was not going to talk to the officer and started walking away. Elijah Alexander inquired what the officer wanted. (TT III, 417). Petitioner appeared to be very irritated, and Alexander appeared to be more relaxed and just wanted to know what was going on. (TT III, 418). Petitioner told Alexander not to talk to the police and "tried to get [Alexander] to walk away with him." (TT III, 418). Wells indicated that both men were later taken into custody, but the circumstances of their arrests were not presented to the jury. Cross-examination established that at some unspecified point, "one individual" was placed in Wells's patrol car. Wells further testified on cross-examination that during the time he was present, petitioner was not found to be in possession of a weapon or a large amount of cash. (TT III, 420-21).

Petitioner argues that his counsel was ineffective "when he failed to object when the prosecutor elicited testimony from Officer Andres Wells, that the defendant at the time of his arrest exercised his V Amendment right to remain silent, and again during closing arguments, where the prosecutor commented on the defendant's assertion of his V Amendment right to remain silent at the time of his arrest." (docket # 1-5, ID# 209). The prosecutor never elicited testimony from Officer Wells regarding any exercise of petitioner's post-arrest right to remain silent.[6] Thus, there was no foundation for an objection to the prosecutor's questions. (TT III, 413-18, 421).

The challenged portion of the prosecutor's closing argument was likewise unobjectionable. The prosecutor's argument included a review of the testimony of each witness in order to demonstrate "how it all fits together." (TT IV, 605-606). He eventually reached the testimony provided by Officer Wells. (TT IV, 621). The prosecutor's argument focused on the initial contact and contrast between Elijah Alexander's willingness to stay and see what Officer Wells wanted and petitioner's unwillingness to answer any questions and his attempts to persuade Alexander not to say anything to the police and to walk away with him. (TT IV, 622-23). Comments about a defendant's pre-custody silence violate no federal constitutional right articulated by a holding of the Supreme Court, *see Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009), or by the Michigan courts, *see People v. Schollaert*, 486 N.W.2d 312, 314-15 (Mich. Ct. App. 1992); *accord People v. McGhee*, 709 N.W.2d 595, 618 (Mich. Ct. App. 2005). Failure to object cannot be deemed ineffective.

---

[6]Petitioner did not elect to remain silent. On cross-examination, he admitted that while in custody he gave false statements to Detective Hatter. (TT IV, 596-98).

Petitioner argues that his attorney was ineffective because he failed to object to the portion of the prosecutor's closing argument set forth in italics below:

> So now you have to add that up with all your other evidence; the testimony of Lazaro Hernandez, Tangie Bates, Elijah Alexander, and Officer Wells. *Clearly what corroborates Elijah Alexander's testimony, Elijah Alexander was going to talk to the police. That's what the officer said. Elijah Alexander didn't try to walk away.*
>
> *The defendant didn't want to cooperate. The defendant tried to walk away.* The defendant tried to get Elijah Alexander to walk way with him. The defendant tried to make Elijah Alexander not speak with the police.

(Pet. Brief at C-68, docket # 1-5, ID# 208) (citing TT IV, 622-23). Petitioner argues that his attorney should have objected to this argument on the ground that it "bolstered the credibility of Elijah Alexander." (docket # 1-5, ID# 208).

The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir.2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to bolster the witness's credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388–89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965). Neither type of "vouching" recognized by the lower federal courts is at issue. Further, the Supreme Court has never recognized "vouching" as a constitutional level claim. There is no "clearly established Federal law, as determined by the Supreme Court of

the United States" against "vouching." 28 U.S.C. § 2254(d)(1); *see Parker v. Matthews*, 132 S. Ct. at 2155 ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court[.]' 28 U.S.C. § 2254(d)(1).").

Petitioner argues: "The prosecutor in his over zealousness, crossed the line, when he inferred to the jury that because Elijah Alexander was willing to talk to the police and the defendant was not, then Elijah Alexander's testimony was more credible than the defendants." (docket # 1-5, ID# 208). The prosecutor's argument was unobjectionable. It did not cross any line that would entitle petitioner to federal habeas corpus relief. Petitioner and Alexander each identified the other as being involved in beating Hernandez. It was a fair inference that the individual who had acted in concert with Mickey Vance would have no desire to speak to the police and would want to walk away before the bloodstains on his clothing were discovered, while the individual who had actually interceded to help the victim would not avoid contact with the police and would not mind answering questions. The prosecutor did not place his personal credibility behind Alexander, nor did he suggest the existence of other evidence. He merely argued that the circumstances supported Alexander's credibility.

Petitioner argues that his trial counsel was ineffective when he failed to object to the jury array. Petitioner's substantive challenge to the jury array is addressed in Section VII, *infra*. For purposes of addressing his related claim of ineffective assistance of counsel, it is sufficient to note that petitioner has failed to show that African-Americans were not fairly represented in the venire from which the petit jury was chosen. He has not demonstrated any deficiency in his trial counsel's actions which would satisfy either prong of the *Strickland* standard.

In summary, all of the claims of ineffective assistance of trial counsel raised by petitioner are meritless. He has not shown that the state-court decision rejecting these claims was an "unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## VI.    Ineffective Assistance of Appellate Counsel

In ground VI, petitioner argues that his appellate attorney was ineffective in failing to raise the claims of ineffective assistance of trial counsel that he raised in his motion for post-conviction relief. (Petition at 13, ID# 13; Ex A-2, docket # 1-3, ID# 24; Ex. B-70, docket # 1-4, ID# 123; Ex. C-49, 76-82, docket # 1-5, ID#s 189, 216-22). Claims of ineffective assistance of appellate counsel are measured under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *See Evitts v. Lucey*, 469 U.S. 387 (1985). Petitioner must prove (1) that appellate counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome. 466 U.S. at 687-88.

Because the state circuit court found that petitioner's claims of ineffective assistance of appellate counsel were meritless, its decision must be afforded deference under AEDPA. *See Harrington v. Richter*, 131 S. Ct. at 784. The "doubly deferential" standard applies to the court's decision rejecting petitioner's claims of ineffective assistance of appellate counsel. *See Knowles*, 556 U.S. at 123.

The court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional

judgment." 466 U.S. at 690. The Sixth Amendment is violated only if counsel's acts or omissions "were outside the wide range of professionally competent assistance." *Id.*

In the case of appellate counsel, petitioner has no constitutional right to have every nonfrivolous issue raised on appeal. *Jones v. Barnes*, 463 U.S. 745, 754 (1983). Appellate counsel acts within the fair range of professional assistance when counsel chooses not to assert weak or unsupported issues on appeal. *See Smith v. Murray*, 477 U.S. 527, 536 (1986). Tactical choices regarding issues on appeal are properly left to the sound judgment of counsel. *See United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). " 'Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy." *Smith v. Murray*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. at 751-52). Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). To overcome the presumption of competence of appellate counsel in these circumstances, a petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert. *Id.*; *see Bourne*, 666 F.3d at 411 (Petitioner "must show the issues his appellate counsel failed to raise were 'clearly stronger' than the issues his counsel did raise – and that the state court lacked a reasonable basis for believing otherwise."). The meritless issues petitioner raised in his motion for post-conviction relief were not clearly stronger than the issues his appellate counsel raised. Appellate counsel has no duty to raise meritless issues. *Evitts*, 469 U.S. at 394; *Lewis v. Alexander*, 11 F.3d 1349, 1354 (6th Cir. 1993).

As for prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v.*

*Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Consequently, counsel's failure to raise an issue on appeal is ineffective assistance "only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005). Petitioner does not approach satisfying this demanding standard. The state-court decision rejecting petitioner's claims of ineffective assistance of appellate counsel was not an unreasonable application of clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

## VII.    Sixth Amendment Fair Cross–Section Claim

In ground VII, petitioner alleges that his Sixth Amendment rights were violated because his jury was not drawn from a fair cross-section of the community. (Petition at 15, ID# 15; Ex A-3, docket # 1-3, ID# 25; Ex. B-71, docket # 1-4, ID# 124; Ex. C-49, 83-92, docket # 1-5, ID#s 189, 223-32). "The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *See Berghuis v. Smith*, 130 S. Ct. 1382, 1387 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)). Petitioner argues that his right to be tried by a jury drawn from a fair cross-section of the community was violated because the panel from which his jury was selected contained only two African–Americans.

To establish a *prima facie* violation of the fair cross-section requirement, petitioner must demonstrate: (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *See Berghuis*, 130 S. Ct. at 1388

(citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). "The first showing is, in most cases, easily made." 130 S. Ct. at 1388. Petitioner has established the first element of a *prima facie* claim. The Supreme Court has recognized that African-Americans are a "distinctive" group in the community, satisfying the first prong of *Duren*. *Peters v. Kiff*, 407 U.S. 493, 498 (1972). Petitioner's claim fails to satisfy the other two requirements necessary to establish a *prima facie* violation of the fair-cross-section requirement.

Petitioner has not shown that African-Americans were not fairly represented in the venire from which the petit jury was chosen. The trial transcript does not indicate the race of any member of the venire, nor the race of any member of the petit jury. No objection was lodged regarding the composition of the venire. Petitioner's counsel expressed satisfaction with the jury selected. (TT I, 244). Petitioner waited until after his trial, the jury's verdict, sentencing, and his unsuccessful direct appeal to express his present concern that his jury was not drawn from a fair cross-section of the community. The record is devoid of evidence supporting petitioner's argument that African-Americans were underrepresented.

Petitioner has not shown that underrepresentation resulted from a systematic exclusion of African-Americans in the jury selection process[7]. Petitioner must show not only that the distinctive group in question was insufficiently represented on the venire from which his jury was selected, but also that such was the case in other venires as well. *See Duren*, 439 U.S. at 366 ("it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire,

---

[7] "If underrepresentation by itself were sufficient to support a holding of unconstitutionality, the second and third prong of *Duren* would effectively collapse into one inquiry." *Bates v. United States*, 473 F. App'x 446, 450 (6th Cir. 2012) (citing *Randolph v. California*, 380 F.3d 1133, 1141 (9th Cir. 2004)).

was due to their systematic exclusion in the jury-selection process") (emphasis added); *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) ("defendants must show more than that their particular panel was unrepresentative"); *McGinnis v. Johnson*, 181 F.3d 686, 690 (5th Cir. 1999) ("one incidence of a jury venire being disproportionate is not evidence of a 'systematic' exclusion"); *Gardner v. Kapture*, 261 F. Supp. 2d 793, 802 (E.D. Mich. 2003) ("a one-time example of underrepresentation of a distinctive group wholly fails to meet the systematic exclusion element").

 "Merely because the percentage of a distinctive group selected in a single venire does not mirror the percentage of the group in the entire community cannot be construed as systematic exclusion." *See United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998) (must show more than that a particular panel was unrepresentative of the community); *Ford v. Seabold*, 841 F.2d 677, 685 (6th Cir.1988); *accord United States v. Martin*, Nos. 11-5888, 11-5893, 2013 WL 656258, at * 16 (6th Cir. Feb. 25, 2013) ("Because [defendants] failed to produce any evidence that under-representation of blacks in [their] venire resulted from systematic exclusion, they did not establish a *prima facie* case.").

Petitioner provided no evidence of systematic exclusion of African-Americans from the venire from which his jury was chosen, much less systematic exclusion.[8] Petitioner's bare assertion of systematic exclusion does not suffice. Petitioner clearly failed to meet this burden. His

---

[8]Petitioner's trial was conducted in 2005. His attempt to rely on factual findings made in connection with *People v. Hubbard*, 552 N.W.2d 493 (Mich. Ct. App. 1996), is misplaced. The process used to obtain the venire from which petitioner's jury was selected was not the same as the one at issue in *Hubbard*. The "process was changed in Kalamazoo County in July 1992" and statistical evidence generated in connection with the *Hubbard* case is "irrelevant" to fair cross section claims based on the current system. *People v. Spencer*, No. 209647, 1999 WL 33445207, at * 7 (Mich. Ct. App. May 7, 1999); *see People v. Williams*, 616 N.W.2d 710, 715 n.3 (Mich. Ct. App. 2000) ("In *Hubbard*, we concluded that the Kalamazoo County jury array procedure was systematically flawed between the mid-1980s and 1992," and the "process was changed to alleviate the problem.").

Sixth Amendment challenge must therefore be rejected. Petitioner has not shown that the state-court decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding." 28 U.S.C. § 2254(d).

## **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:   June 5, 2013          /s/  Joseph G. Scoville
                               United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).